# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DONALD J. INSEL, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 5:13-903 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of | § | |
| Social Security, | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION

Donald John Insel ("Insel") seeks review of an adverse decision on his applications for disability-based social security benefits.

## I.  Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Reviewing courts also must take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights").

## II. Background

Insel applied for disability insurance benefits and supplemental security income claiming disability due to "diabetes, back injury, depression, left and right shoulder injury, high blood pressure, high cholesterol, heart problems, and shortness of breath," commencing May 29, 2009. (T. 168).[1] An evidentiary hearing was held before an administrative law judge, Marie Greener ("ALJ Greener"). (T. 12, 30-58). Insel, represented by counsel, attended and testified. (*Id.*).

ALJ Greener denied Insel's applications. (T. 12-24). The Appeals Council denied Insel's request to review. (T. 1-6). Insel then instituted this proceeding.

## III. Commissioner's Decision

Under the Social Security Act, "disability" means "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the individual] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner prescribes by regulation a five-step sequential evaluation procedure which is approved by courts as a fair and just way to

---

[1]    "T." followed by a number refers to the page of the administrative record.  (Dkt. No. 6).

determine disability applications in conformity with the Social Security Act.[2] ALJ Greener employed this method when adjudicating Insel's claim. Critical findings are summarized below.

## A.    Step 2 Findings

At Step 2, administrative adjudicators determine existence and severity of impairments.[3] ALJ Greener found that Insel suffers from severe impairments consisting of *right shoulder* and *back* impairments and "a possible history of *emphysema*." (T. 14) (emphasis added). She found other impairments not severe because they caused no more than minimal effect in Insel's ability to perform basic work activities. These additional but non-severe impairments are: *diabetes mellitus type II*, *obesity*, *hypertension*, *hyperlipidemia*, *left shoulder impairment*, and *depression*. (T. 14-15).

---

[2]     The procedure is "sequential" in the sense that when a decision can be reached at an early step, remaining steps are not considered. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[3]     "Impairments" are "anatomical, physiological, or psychological abnormalities . . . demonstrable by medically acceptable clinical and laboratory techniques." *See* 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D); 20 C.F.R. §§ 404.1508, 416.908.

"Severe impairments" are those that significantly limit physical or mental abilities to do basic work activities. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b); *see also* SSR 85-28, TITLES II AND XVI: MEDICAL IMPAIRMENTS THAT ARE NOT SEVERE, 1985 WL 56856, at *3-4 (SSA 1985). In this Circuit, a Step 2 severity inquiry serves only to "screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). Consequently, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' . . . [with] . . . 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 154 n. 12 (1987)).

## B.    Step 3 Finding

At Step 3, administrative adjudicators decide whether severe impairments meet or medically equal a presumptively disabling impairment in the Commissioner's "Listings."[4] ALJ Greener determined that Insel's severe shoulder and back impairments are not of Listings-level severity.

ALJ Greener's decision contains no finding or discussion relating to whether Insel's emphysema meets or medically equals a Listing for respiratory disorders.[5]

## C.    Residual Functional Capacity Finding

Before proceeding to the remaining sequential steps, ALJ Greener determined Insel's "residual functional capacity."[6] She found that, despite his impairments, Insel retains capacity to perform work at the light exertional level, except that he must avoid exposure to pulmonary irritants.  (T. 17).

---

[4]     The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected.   20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").   Listed impairments are presumptively disabling.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).

[5]     Listing 3.00 (respiratory system) presents an unusually complex and technical set of criteria for respiratory disorders.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. §§ 3.00-3.10.  While emphysema is not mentioned specifically, cases suggest that it should be evaluated at Step 3 under Listing 3.02A for progressive chronic obstructive pulmonary disease.  *See Gammon v. Astrue*, No. 09-0341, 2011 WL 529811, at *3 (W.D. Mo. Feb. 7, 2011); *see also Miles v. Barnhart*, No. 6:06-CV-391 (LEK/GHL), 2008 WL 5191589, at *7 (N.D.N.Y. Dec. 8, 2008) ("COPD is analyzed under Listing 3.02(A).").

[6]      "Residual functional capacity" refers to what persons can still do in work settings despite physical and/or mental limitations caused by their impairments and related symptoms, such as pain. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* SSR 96-8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *2 (SSA July 2, 1996).

When making this determination, ALJ Greener weighed medical opinion and Insel's subjective testimony. With respect to Insel's *physical* residual functional capacity, she gave "little weight" to opinions of Insel's treating surgeon, Dr. John Cambareri, M.D. (T. 21). Instead, she relied on reports from Dr. Muhammad Toor, M.D., a consultative examining physician, and Dr. Mark L. Goodman, M.D., an "independent medical examiner" in a separate pending workers' compensation proceeding.

ALJ Greener made no findings and included no discussion of Insel's *mental* residual functional capacity. She did, however, find Insel's depression to be a "medically determinable mental impairment." (T. 15).

Finally, ALJ Greener concluded that Insel's subjective self-assessments concerning intensity, persistence and limiting effects of his impairment-related symptoms "are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (T. 18).

D.    *Step 4 and Step 5 Findings*

ALJ Greener found that Insel's residual functional capacity for light work with no exposure to pulmonary irritants precludes performance of his past relevant work as a truck driver. (T. 22). Insel thus carried his burden to prove a *prima facie* case of disability.[7] The burden then shifted to the Commissioner to show at Step 5 that Insel can still perform alternative and available work.[8]

At Step 5, ALJ Greener determined that Insel can still engage in alternative, available work. (T. 23). To make this finding, ALJ Greener

---

[7]    *See Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984).

[8]    *See* 20 C.F.R. §§ 404.1566, 416.966; *see also DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) (quoting *Berry*, 675 F.2d at 467).

consulted Medical–Vocational Guidelines commonly referred to as "the grids."[9] (T. 23). She concluded that a finding of "not disabled" was appropriate under the framework of Rule 202.21, and Insel's application was denied. (*Id.*). She acknowledged that the grids do not account for nonexertional limitations such as inability to tolerate pulmonary irritants, but concluded that this limitation has little or no effect on Insel's "occupational base of unskilled light work."

## IV.   Points of Alleged Error

Insel's brief proffers three points of error stated verbatim below:

1.   The ALJ's RFC determination is not supported by substantial evidence;

   A.   The ALJ improperly discounted the opinion of treating physician, Dr. Cambareri; and

   B.   The ALJ failed to address all of Plaintiff's limitations in her RFC determination;

2.   The ALJ erred in failing to make a proper credibility finding; and

3.   The ALJ's Step 5 finding is not supported by substantial evidence.

(Dkt. No. 10, pp. 15-23).

The Commissioner's brief responds to each point, arguing generally that ALJ Greener's decision reflects application of correct principles of law, and that her factual findings are supported by substantial evidence. The Commissioner argues, alternatively, that if ALJ Greener erred at Step 5 (Insel's third point), the error was harmless.

---

[9]      The Medical Vocational Guidelines are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996).

# V.  Unasserted Error

Insel does not complain of ALJ Greener's findings at Steps 2 and 3 of sequential evaluation.  Nonetheless, a reviewing court in this circuit must independently " ' conduct a searching inquiry and . . . scrutinize the entire record, having in mind that the Social Security Act ... is remedial in purpose.' " *Monette v. Astrue*, 269 Fed. App'x 109, 110 (2d Cir. 2008) (quoting *McBrayer v. Secretary of Health & Human Servs.*, 712 F.2d 795, 798–99 (2d Cir. 1983)). Accordingly, these two findings must be reviewed as a threshold matter.

Independent review of the evidentiary record discloses no evidence of more than minimal effect on ability to engage in work activity attributable to any of the alleged *physical* impairments that ALJ Greener found non-severe.  As for Insel's *mental* impairment of depression, ALJ Greener utilized and properly applied a "special technique" prescribed by regulation for assessing severity of mental impairments.[10]  Hence, there was no Step 2 error.

At Step 3, ALJ Greener properly found that Insel's physical back and shoulder impairments do not meet or medically equal the Commissioner's Listings 1.02 (major dysfunction of a joint(s) (due to any cause) or 1.04 (disorders of the spine).  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. §§ 1.02, 1.09.  She erred, however, in failing to determine whether Insel's emphysema meets the requirements of Listings 3.00-3.10 (respiratory system/disorders).

Even so, such error was harmless.  For example, Listing 3.02A (chronic obstructive pulmonary disease) requires evidence of a forced expiratory volume

---

[10]     *See* 20 C.F.R. §§ 404.1520a(b)-(e), 416.920a(b)-(e); *see also Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008) (describing analysis).

in one second (FEV1) at a particular value.[11] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 3.02(A). FEV1 is measured through use of an instrument called a "spirograph" both before and after the patient inhales a "bronchodilator" medication. *See id.*, at § 3.00(E). A searching inquiry of the entire evidentiary record fails to disclose any of those elements. Hence, the court confidently can conclude that the result would have been the same absent the error, and that Insel's substantial rights were not affected by the error.

## VI. Challenges to Residual Functional Capacity Assessment

Insel's first asserted error consists of a two-pronged challenge to ALJ Greener's crucial finding of residual functional capacity for work-related activities. Insel asserts that ALJ Greener improperly rejected or discounted opinions of his treating orthopedic surgeon, Dr. John Cambareri, M.D., with respect to functional effects of his physical impairments. (Dkt. No. 10, pp. 15-19). Additionally, Insel maintains that ALJ Greener failed to incorporate into her residual functional capacity assessment functional effects of his medically determinable, impairment of depression. (*Id.*, pp. 19-21). Insel argues that these errors produced a flawed residual functional capacity assessment unsupported by substantial evidence. (*See id.*, p. 21).

### A. *Weighting of Medical Opinions Regarding Physical Limitations*

1. <u>Evidence</u>

   a. *Dr. John Cambareri, M.D.*

Insel's treating surgeon, Dr. Cambareri, with Syracuse Orthopedic Specialists, treated Insel over a period of many years. He performed left

---

[11]     An individual meets the criteria of Listing 3.02A when "[c]hronic obstructive pulmonary disease, due to any cause, with the [forced expiratory volume (FEV1)] equal to or less than the values specified in table I corresponding to the person's height without shoes." 20 C.F.R. pt. 404, subpt. P, App. 1, § 3.02(A).

shoulder decompression surgery in 2005 (T. 512-13), and right shoulder decompression surgery in 2009 (T. 414-15). In 2010, Dr. Cambareri began treating Insel for lumbar pain. (T. 357-60). From June 2009 until January 2011, Dr. Cambareri treated Insel 18 times. In a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)"[12] dated January 5, 2011, Dr. Cambareri opined that Insel now can occasionally lift/carry less than 10 pounds, is limited in his ability to push/pull in both his upper and lower extremities, and in an 8-hour workday can stand/walk less than 2 hours and sit for less than 6 hours. (T. 484-87). Additionally, Dr. Cambareri found that Insel is unable to climb, balance, kneel, crouch, crawl, or stoop, and can only reach and handle on occasion. (*Id*.).

> b. *Dr. Muhammad Toor, M.D.*

Consultative examining physician, Dr. Toor, saw Insel once on January 24, 2011. (T. 448-53). Dr. Toor observed that Insel was then in no acute distress, had a normal stance, used no assistive devices, needed no help changing for the exam or getting on and off the exam table, and was able to rise from a chair without difficulty. (T. 450-51). There were, however, positive diagnostic signs during physical examination consisting of limited range of motion in his cervical spine, positive straight leg raising bilaterally, and limited range of motion in both shoulders and both hips. (T. 451-52). Dr. Toor ultimately opined that Insel has *no* limitations in his ability to sit, but *moderate* limitations in his ability to stand for long periods of time, climb, push, pull and carry heavy objects. (T. 453). Additionally, Dr. Toor stated that Insel should avoid smoke, irritants and inhalants, and, because of a history of myocardial infarction, should avoid excessive strenuous activities. (*Id*.).

---

[12]    Social security administration form (HA-1151).

### c.    Dr. Mark L. Goodman, M.D., CIME

Dr. Goodman saw Insel several times in his capacity as an "independent medical examiner" in a workers' compensation proceeding.[13]  After one early visit, Dr. Goodman reported:

> At the preset time the claimant has *no disability* and *no restrictions*, and in fact is scheduled to return to his regular job without restrictions, with the exception of using power steering, on 10/27/10.

(T. 236) (emphasis added).  Dr. Goodman qualified that report, however, by adding:

> *He is not sure he will be able to manage with his job, which does involve a considerable amount of heavy lifting, pushing, pulling, crawling, and climbing and also some overhead lifting and reaching but he feels he may be able to manage this and is willing to try to do so. . . . .*

(*Id.*) (emphasis added).

### d.    Dr. James P. Newman, M.D.

Dr. Newman, an orthopedic surgeon also with Syracuse Orthopedic Specialists, examined Insel for continued right shoulder pain 7 months status post surgery at the request of his colleague Dr. Cambareri.  (T. 361).  Dr. Newman recommended a second right shoulder decompression. (T. 363).  In July 2010, Insel underwent another right shoulder decompression surgery with Dr. Newman. (T. 411-13).  Five months status post his second right shoulder decompression surgery, December 2010, Dr. Newman observed that Insel had tenderness at the acromioclavicular joint ("AC joint") and that Neer Impingement and Crossover Impingement signs were both positive.  (T. 318). Dr. Newman provided Insel with an AC joint injection to help with Insel's pain; however, it was only minimally effective.  (T. 417).

---

[13]    Dr. Goodman examined Insel on multiple occasions as well as supplied an "addendum to a report," including: October 2009 (T. 223-26); February 2010 (T. 227-30); June 2010 (T. 231-33); September 2011 (T. 541-43).

## 2. ALJ Greener's Weighting of Medical Opinion Evidence

ALJ Greener chose to give "little weight" to treating surgeon Dr. Cambareri's opinions regarding Insel's functional limitations attributable to his physical impairments. She articulated three principal reasons: (1) Dr. Cambareri's medical source statement was "filled out . . . on January 5, 2011, but . . . not stamped;" (2) Dr. Cambareri's opinions were "not consistent with the record;" and (3) Dr. Cambareri's opinions were "partially based . . . on a left shoulder impairment . . . [but] . . .there are no allegations of left shoulder problems after the alleged onset date and his left shoulder surgery was in 2005." (T. 21). Elsewhere in her decision, ALJ Greener discerned that Dr. Cambareri's rating of Insel's disability for workers' compensation purposes seemed to be at odds with his clinical treatment notes and Insel's subjective accounts of his condition.[14] Finally, ALJ Greener found significant an evidentiary video developed during Insel's workers' compensation case that showed Insel repairing a wall and lifting cinder blocks after his alleged disability onset date. (T. 22).

ALJ Greener elected to give "some weight" to consultative examiner Dr. Toor's opinions. She declined to give it greater weight because it was "partially based on a myocardial infarction that never existed" and because Dr. Toor's assessments of limited ranges of motion "are not consistent with the rest of the record." (T. 22).

ALJ Greener did not state any level of weight afforded to findings and opinions from Dr. Newman and Dr. Goodman. She expressly stated, however, that she relied on Dr. Goodman's report, as well as the report from Dr. Toor. (*Id.*)

---

[14] ALJ Greener noted what she viewed as inconsistencies in Dr. Cambareri' treatment notes dated January 5, 2010, June 14, 2010, February 3, 2011, March 7, 2011, August 24, 2011, March 7, 2011, October 11, 2011, and November 3, 2011. (T. 19-21).

3.    Insel's Challenge

Insel argues that ALJ Greener's articulated bases for rejecting Dr. Cambareri's opinions are patently unreasonable. First, Insel asserts that authenticity of Dr. Cambareri's medical source statement cannot be doubted because he signed and dated it, and the evidence suggests no reason to think that it came from another source despite it not being "stamped." Second, he argues (at length and with numerous transcript references) that Dr. Cambareri's opinions are *not* inconsistent with Insel's longitudinal medical record. Third, Insel points out that Dr. Cambareri's opinions were not based primarily on a pre-onset left shoulder surgery, but on Insel's status post-*bilateral* shoulder decompressions *and* lumbar radiculopathy. (Dkt. No. 10, pp. 15-21).

Insel amplifies these attacks with references to the "treating physician rule" (discussed below), and contends that ALJ Greener erred by not giving Dr. Cambareri's opinions controlling weight. Alternatively, Insel argues that ALJ Greener erred by failing to apply a 6-factor analysis (also discussed below) to determine how much weight to afford those opinions. (Dkt. No. 10, p. 16).

4.    Governing Legal Principles

Administrative law judges must give controlling weight to opinions of treating sources regarding the nature and severity of impairments, provided they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In social security jurisprudence, this is referred to as the "treating physician rule." *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (treating physician rule

generally requires deference to the medical opinion of a claimant's treating physician).

When controlling weight is *not* afforded to treating source opinion, or when *other* medical source opinion is evaluated with respect to severity of impairments and how they affect individuals' ability to function, the degree of weight to be given such evidence is determined by applying certain generic factors: (1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship; (3) evidence supporting the opinion; (4) how consistent opinion is with record as a whole; (5) specialization in contrast to condition being treated; and (6) other significant factors.  20 C.F.R. §§ 404.1527(c), 416.927(c).

    5.   <u>Application and Discussion</u>

ALJ Greener stated that she evaluated all medical opinion evidence "in accordance with the requirements of 20 CFR 404.1527 and 416.927." (T. 17). One must assume, therefore, that she was aware of the treating physician rule, and that she intended to apply it.

By expressly electing to give the treating surgeon's opinions *little* weight, ALJ Greener obviously declined to give them *controlling* weight.  Beyond that, however, one is hard-pressed to discern any 6-factor analysis by ALJ Greener to determine how much weight to afford Dr.  Cambareri's opinions, or, for that matter, how much weight to afford other medical opinions from non-treating sources in the evidentiary record.  Hence, there is considerable initial appeal to Insel's argument that ALJ Greener erred by failing to apply correct principles of law when weighting medical opinion evidence.

Courts conducting judicial review in social security cases, however, do not require perfect opinions or rigid, mechanical, formulaic applications of governing

legal principles.  *See Atwater v. Astrue*, 512 Fed. App'x 67, 70 (2d Cir. 2013) (summary order) ("no such slavish recitation of each and every factor [20 C.F.R. § 404.1527(c)] [is required] where the ALJ's reasoning and adherence to the regulation are clear"); *see also Halloran*, 362 F.3d at 31–32 (affirming ALJ opinion which did "not expressly acknowledge the treating physician rule," but where "the substance of the treating physician rule was not traversed").[15]  In some instances, for example, an evidentiary record may be silent with respect to a prescribed analytical factor, such that addressing that factor would be superfluous.

One cannot assume, therefore, that ALJ Greener's mere failure to explicitly apply the applicable 6-factors *seriatim* equates to a violation or ignorance of governing law. Rather, the court must cipher her decision in the whole to determine whether it reflects analytical and substantive equivalence. In that respect, a reviewing court cannot independently apply the prescribed 6-factor analysis and make a *de novo* determination of weight due to opinions of Dr. Cambareri and other medical sources.  It can only determine whether ALJ Greener's articulated reasons traversed the substance of the governing legal principle and whether those reasons are supported by substantial evidence.

---

[15]    The Second Circuit is consistent on this point.  *See Cichocki v. Astrue*, 729 F.3d 172, 177-78 (2d Cir. 2013) (declining to adopt a *per se* rule that failure to provide a prescribed function-by-function analysis of residual functional capacity is grounds for remand); *see also, Judelsohn v. Astrue*, No. 11-CV-388S, 2012 WL 2401587, at *6 (W.D.N.Y. June 25, 2012) and *Oliphant v. Astrue*, No. 11-CV-2431, 2012 WL 3541820, at *22 (E.D.N.Y. Aug. 14, 2012) (both declining to view a 7-factor analysis prescribed by regulation for assessing subjective credibility as a rigid prerequisite).  The gist of all these cases is that reviewing courts are more concerned with whether an administrative decision reflects that the entire record was considered, whether the substance of a prescribed analytical protocol was not traversed, and whether the determination is supported by substantial evidence.  (*Id.*).

In that limited analytical context, ALJ Greener's method of determining credibility of treating physician opinion substantially adheres to the regulation. Although her reasoning that Dr. Cambareri's medical source statement was not "stamped" is inane, her second reason that Dr. Cambareri's opinions were inconsistent with the longitudinal record and consultative opinion equates precisely with Factor 4 (how consistent opinion is with record as a whole) under the governing regulation. Her observations that Dr. Cambareri's reports regarding Insel's total disability were unsupported by his treatment notes on several occasions relate directly to Factor 3 (evidence supporting opinion). Finally, ALJ Greener's reasoning that Dr. Cambareri based his opinion in part on a left shoulder impairment for which there were no supporting allegations or evidence after the alleged onset date, and her interpretation of the evidentiary video (which she viewed as showing Insel to be capable of repairing a wall and lifting cinder blocks) both relate to Factor 6 (other significant factors). Under this circumstance, substantive adherence to the governing regulation is apparent.

Whether substantial evidence supports ALJ Greener's *application* of those factors is another matter. Literally, ALJ Greener was correct when stating that Dr. Cambareri's opinions were *partially* based on a 2005 left shoulder surgery and that Insel based no current disability claim on a left shoulder impairment. In fairness, however, ALJ Greener should have recognized that Dr. Cambareri's opinion was not limited to left shoulder decompression, but, instead, was based also on status post *bilateral* shoulder decompressions and *lumbar* radiculopathy. (T. 485).

Similarly, ALJ Greener correctly observed that Dr. Cambareri's opinions were inconsistent in part with certain opinions expressed by consultative examiner, Dr. Toor and independent medical examiner, Dr. Goodman. In

fairness, however, Dr. Toor opined in a January 2011 internal medicine examination that Insel's "capacity to stand for long periods of time, climb, push, pull, or carry heavy objects would be moderately limited due to his medical conditions." (T. 453). Dr. Goodman, although stating after an early examination that Insel had no disability and no limitations (other than driving a vehicle without power steering) did qualify that statement by noting that Insel was unsure about his ability to return to work but was willing to try. Additionally, Dr. Goodman opined following an examination on September 26, 2011, that Insel "qualifies for a total of 70% schedule loss of use of the right arm." (T. 543).

Finally, Dr. Newman's examination found AC joint tenderness and positive diagnostic signs regarding Neer Impingement and Crossover Impingement. (T. 318). An AC joint injection was only minimally effective in reducing Insel's pain. (T. 417).

Under these circumstances, ALJ Greener's decision to give Dr. Cambareri's treating-physician opinions little weight due to inconsistency with the record as a whole borders on being patently unreasonable. The undersigned, however, declines to find that *no* reasonable mind could have found Dr. Cambareri's opinions lacking credibility for this stated reason. Accordingly, ALJ Greener's credibility choice on that ground must be deemed supported by substantial evidence.[16]    And, since there also are arguable internal inconsistencies in Dr. Cambareri's treatment notes, and extrinsic video graphic evidence debatably showing Insel engaging in more strenuous physical activity than Dr. Cambareri considered him able to do, the court must conclude that

---

[16]    "Substantial Evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 378, 401 (1978); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Halloran*, 362 F.3d at 31.  Under this low threshold, evidence is substantial even if <u>most</u> reasonable minds might reject it.

more than a scintilla of evidence (but perhaps only a nano particle more), supports ALJ Greener's decision to give Dr. Cambareri's opinions only little weight.[17]

ALJ Greener's weighting of medical opinion evidence as it relates to functional limitations associated with Insel's physical impairments thus survives judicial review by the slenderest of threads.

*B.    Lack of Additional Limitations in Residual Functional Capacity*

Insel next argues that ALJ Greener's residual functional capacity assessment is unsupported by substantial evidence because she did not consider limitations and restrictions imposed by all of Insel's impairments, both severe and those not severe. (Dkt. No. 10, pp. 19-21). Insel complains specifically about ALJ Greener's failure to incorporate limitations addressing vocational effects of his mental impairment of depression. (*Id.*).

1.    Applicable Law

All medically-determinable impairments – severe and non-severe – must be considered and factored into a valid residual functional capacity assessment.[18] At first blush, one might question the utility of this rule because non-severe impairments – by definition – are only slight abnormalities with no more than

_____

[17]    "Substantial Evidence" is a term of art meaning less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla." *See Richardson*, 402 U.S. at 401; *Moran*, 569 F.3d at 112; *Halloran*, 362 F.3d at 31.  Stated another way, to be "substantial," evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.*, 306 U.S. 262, 299-300 (1939) (cited in Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed. 1991)).

[18]    *See* 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945; SSR 96-8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *5 (SSA July 2, 1996).

minimal effect on ability to work. The Commissioner, however, has articulated a sound rationale for requiring that non-severe impairments be addressed a second time at the residual functional capacity determination stage of sequential evaluation:

> While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

SSR 96–8p, 1996 WL 374184, at *5.

2.   <u>Discussion</u>

ALJ Greener found that Insel has several non-severe impairments. (*See* listing in Section III.*A supra*.) In the boilerplate section of her decision titled "Applicable Law," ALJ Greener acknowledged her duty to consider them in conjunction with Insel's severe impairments when assessing his residual functional capacity. (T. 13). In her actual determination, however, ALJ Greener never mentioned or otherwise factored into her discussion and articulation of residual functional capacity a single one of Insel's non-severe impairments, physical or mental.

As for Insel's non-severe *physical* impairments, ALJ Greener's omission of further consideration at the residual functional capacity stage is a harmless error. The record is devoid of any evidence that such impairments affect Insel's ability to perform ordinary work activities or work on a regular and continuing basis. Hence, the court can conclude that the result would have been the same absent the error.

As for Insel's medically-determinable but non-severe *mental* impairment, the record contains evidence from a competent medical source (consultative psychiatric examiner, Dr. Jeanne A. Shapiro, Ph.D.) that Insel may have difficulty adequately understanding and following instructions and directions, completing tasks due to memory and concentration deficits, interacting appropriately with others due to social withdrawal, attending work or maintaining a schedule due to lack of motivation and lethargy, and managing stress. (T. 446). ALJ Greener was obliged, therefore, to consider these functional effects associated with Insel's depression when determining Insel's residual functional capacity.

Because ALJ Greener earlier decided (at Step 2) to afford little weight to Dr. Shapiro's opinions, there is a logical inference that she would not have added any additional nonexertional limitations due to depression when articulating Insel's residual functional capacity even if she were to have considered his mental impairment at that stage. The court, however, cannot casually declare her error harmless on that basis alone. Rather, the court must first consider ALJ Greener's reasons for rejecting Dr. Shapiro's opinions. If those reasons were sound and supported by substantial evidence, thus rendering her credibility choice valid, the court might again excuse ALJ Greener's error as harmless.

ALJ Greener gave little weight to Dr. Shapiro's opinions because she found them to be internally inconsistent and unsubstantiated by other evidence in the record. (T. 16). She found Dr. Shapiro's *diagnosis* of Intel's intact memory inconsistent with her *opinion* that Insel has memory deficits. (*Id*.). She did not specify why she considered Dr. Shapiro's opinions unsubstantiated by the record.

Both articulated reasons are patently unreasonable. A person with generally intact memory can also suffer from specific memory deficits. It is a *non sequitur*, moreover, to discount as "not substantiated" a competent medical opinion when it is the *only* medical source opinion on the subject. Were there other evidence containing conflicting or divergent opinions from equally competent sources, ALJ Greener could reject any opinion that she might reasonably view as going against the weight of the evidence. Here, however, Dr. Shapiro's consultative examination report is the *only* medical source opinion evidence regarding Insel's mental capacity for work activities. No other mental health provider submitted a forensic statement concerning Insel's mental capacity for work activities. Thus, there is no other relevant medical source evidence against which Dr. Shapiro's opinions could be compared. To discredit it as unsubstantiated in that context was arbitrary and unfair.

Other treating sources dealt with Insel's depression, and their clinical treatment notes more nearly support rather than contravene or discredit Dr. Shapiro's opinions. Insel's primary care physician, Dr. James F. Lawless, M.D., diagnosed Insel with a major recurrent depressive disorder and prescribed medications. (T. 238-47). Nurse practitioner, Judith C. Garrett, N.P., referred Insel to a psychiatrist. (T. 510). Social worker and counselor, Kristin Botwinick, LCSW-R, reported that Insel exhibited clinically significant symptoms of depression.[19] (T. 511). Finally, psychiatrist, Roger G. Levine, M.D. diagnosed Insel with anxiety disorder. (T. 536-37). There is nothing in their records that

---

[19]    ALJ Greener also elected to give little weight to Ms. Botwinick's opinions because they were "purely reporting the claimant's subjective allegations." (T. 16). This simply is inaccurate. Ms. Botwinick's report states that Insel <u>exhibited</u> clinically significant symptoms, and that his <u>affect</u> was depressed. (T. 511). These were independent professional observations, not a regurgitation of Insel's subjective complaints.

impugns Dr. Shapiro's opinion that Insel may have nonexertional vocational limitations attributable to his mental impairment.

### 3.   Conclusion

A residual functional capacity assessment that improperly ignores functional effects of non-severe impairments is flawed. A decision based on a flawed residual functional capacity assessment is not supported by substantial evidence. ALJ Greener's residual functional capacity assessment is flawed for reasons stated above. Accordingly, the Commissioner's decision must be reversed and the case remanded for further proceedings.

## VII.   Remaining Points

Insel's remaining points of error complain of ALJ Greener's rejection of his subjective evidence concerning intensity, persistence and limiting effects of his impairment-related symptoms as well as ALJ Greener's Step 5 findings. It is unnecessary to consider these points in detail because this action must be remanded due to the residual functional capacity error identified in the preceding section, and the result will not change whether or not these additional proffered errors are sustained or rejected. Upon remand, however, the Commissioner should remain mindful of both contentions.

Insel argues that ALJ Greener unfairly cherry-picked his subjective statements, disregarding his complete statements and taking them out of context, so as to make him appear unbelievable. Reassessing Insel's credibility in a manner that cannot be fairly criticized as so misreading or misconstruing his subjective statements as to suggest a failure to consider all the relevant

medical and other evidence will make it less likely that another action for judicial review will be necessary.[20]

Insel argues that ALJ Greener had no evidence to support her Step 5 finding that his nonexertional limitation that requires him to avoid exposure to respiratory irritants does not substantially erode his occupational base for light work. Should the same Step 5 finding be made on remand, producing and articulating an evidentiary basis for that finding, and factoring the Commissioner's administratively-noticed facts contained in SSR 85-15[21] will render the decision less vulnerable to attack.

## VIII.  Disposition

For reasons stated herein, the Commissioner's decision will be REVERSED and REMANDED, pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings with instructions to (a) reassess Insel's residual functional capacity in consideration of both severe and nonsevere impairments (*e.g.*, depression, postural and environmental limitations); and (b) conduct further proceedings as deemed necessary and in accordance with the decision of the court.

Signed on the ___26___ day of ___September___ 2014.

Earl S. Hines
United States Magistrate Judge

---

[20]    *See Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010)("Because the ALJ's adverse credibility finding, which was crucial to his rejection of Genier's claim, was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider all of the relevant medical and other evidence, . . . and cannot stand.").

[21]    SSR 85-15, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK —THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857, at *8 (SSA 1985)("Where the environmental restriction falls between very little and excessive, resolution of the issue will generally require consultation of occupational reference materials or the services of a VS [Vocational Specialist].").